UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICHARD CHAKLOS and ANDREW WIST,<br><br>      Plaintiffs,<br><br>   v.<br><br>KATHLEEN STEVENS, MICHAEL SHEPPO, DONNA METZGER, RICHARD KARPAWICZ, CRAIG ALLEN, SUSAN VONDRAK, and MICHAEL YOKLEY,<br><br>      Defendants. | Case No. 06-cv-4063-JPG |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants Kathleen Stevens, Michael Sheppo, Donna Metzger, and Susan Vondrak's Motion for Summary Judgment (Doc. 31). For the following reasons, the Court **GRANTS** the Motion.

**BACKGROUND**

**I.      Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000). The Court construes all facts in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.

## II.     Facts

Plaintiffs Richard Chaklos (Chaklos) and Andrew Wist (Wist) were employed by the Illinois State Police (ISP) to train forensic scientists. Wist trained scientists in DNA analysis and Chaklos trained scientists in drug chemical analysis. In addition to their duties with ISP, Chaklos and Wist owned and operated Midwest Forensic Services, Inc. (MFS). Additionally, Wist had assisted the National Forensic Science Training Center (NFSTC) in developing a training program for ISP trainees, and had taught occasionally at NFSTC. NFSTC is a not-for-profit company established by the American Society of Crime Directors to provide quality assistance to crime laboratories, to validate certain types of scientific techniques, and to establish standards within the community of crime scene laboratories. In the past, NFSTC has conducted training for ISP personnel at no cost to the State of Illinois.

During the period in question, Colonel Kathleen Steven (Stevens) was Deputy Director of the Forensic Services Command. Michael Sheppo (Sheppo) was both Commander of ISP's Forensic Services Bureau and President of the NFSTC's Board of Directors. Donna Metzger (Metzger) was Assistant Commander of ISP's Forensic Services Bureau, and reported to Sheppo. Susan Vondrak (Vondrak) was the director of training for the forensic services command, whose duties included supervising Chaklos and Wist.

In 2004, the State of Illinois released money to ISP to hire and train 14 (later 15) new forensic scientists to help alleviate a backlog in the analysis of DNA samples, a condition that had gotten a lot of attention in the press. The forensic science command held meetings to discuss how best to train the new hires. In an email, Wist suggested various options: that the group could be split into two or three smaller groups and trained at various laboratories

throughout the state; that the trainees could be sent as one large group to the NFSTC; that some trainees could be sent to NFSTC and others trained internally at ISP facilities; or that ISP could look for external space within the State of Illinois to train new hires. At the time he outlined these options, Wist believed that any training provided by NFSTC would be federally funded and would not entail a cost to the State of Illinois.

ISP follows the State of Illinois Department of Central Management Services (CMS) procedures for determining whether a contract for services should be opened for competitive bids or "sole sourced." These procedures call for competitive bidding unless the Procurement Officer determines that there is only one economically feasible source able to meet the requirements of the contract. Craig Allen (Allen), ISP's Procurement Officer believed that the training contract should be competitively bid. Nevertheless, on or about March 22, 2004, Allen was informed that the Director of ISP, on the recommendation of the forensic science command, had decided that the contract would be sole sourced to NFSTC, rather than put up for bid. The cost to the State of Illinois for the contract would be nearly $750,000. Allen, as an ISP officer, was bound to follow the Director's order. However, Allen and purchasing and accounting section manager, Michael Yokley (Yokley), were concerned about Sheppo's possible conflict of interest arising from his position with NFSTC. Yokley forwarded his concerns up the chain of command.

CMS procedures require that notice of sole sourced contracts be published at least 14 days prior to execution in order for venders to challenge the decision not to allow competitive bids. Although the procedures specified challenges from vendors, ISP's Procurement Officer would consider challenges from any Illinois resident. On March 26, in a letter (the protest letter)

signed by Wist and Chaklos, MFS protested the awarding of a no-bid contract to NFSTC for the training of personnel in DNA analysis. The letter indicated that MFS could conduct equivalent training at a lower cost to the state, and further indicated that some of MFS's competitors might also be able to submit competitive bids for services equivalent to those provided by NFSTC.

      As a result of the protest letter, Colonel Harold Nelson (Nelson), Deputy Director of ISP Division of Internal Investigations (DII) and Captain Karpawicz, Asistant Deputy Director of DII attended a meeting with Stevens, Sheppo, Metzger, and Chief Legal Counsel Keith Jensen. At the meeting, the participants decided that the procurement office would handle the protest for the contract. Nelson was then questioned as to whether Chaklos and Wist should be investigated for possible violations of ISP policy and conflicts of interest. Metzger believed that Wist and Chaklos had violated ISP policy and committed ethical violations by submitting the protest letter, which could be interpreted as soliciting secondary employment which mirrored their ISP responsibilities without prior approval. Nelson responded that he did not feel an investigation was warranted. Nevertheless, DII opened an investigation into whether Wist and Chaklos had violated ISP policy by submitting the protest letter. DII found that the protest letter did violate ISP policy. August 11, 2004, Stevens conducted a meeting with the forensic command staff, the head of labor relations, and the Equal Opportunity Officer to discuss the findings of the investigation and the possible discipline to be imposed. In October 2004, Director Trent approved a 30-day suspension of Chaklos and Wist, which was later rescinded.

      Chaklos and Wist filed a First Amendment retaliation claim under 42 U.S.C. § 1983, maintaining that because their protest letter was protected speech, the investigation and suspension that it brought about constitute unlawful retaliation. Defendants counter that the

protest letter was not protected speech. They further assert that even if the protest letter was protected speech, they are protected by qualified immunity because the law had not clearly established that a bid protest submitted by an employee constitutes protected speech.

## ANALYSIS

Qualified immunity is a defense available to government officials performing discretionary functions which affords them protection from civil liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In the absence of conduct which clearly violates an individual's constitutional rights, qualified immunity attaches. *Id*. The existence of qualified immunity is not for the jury; rather it is a question of law for the court. *Maltby v. Winston*, 36 F.3d 548 (7th Cir. 1994). Plaintiffs bear the burden of overcoming the invocation of qualified immunity. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

A two-part test is used to analyze whether qualified immunity exists. First, the plaintiff must establish that the actions of the defendant violated his constitutional rights. *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 496 (7th Cir. 1993). Second, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). For the following reasons, the Court finds that the suspension of Wist and Chaklos did violate their First Amendment rights, but that the contours of that right were not sufficiently clear that a reasonable ISP official would have understood that suspending the two violated it.

**I.     Under the *Pickering* Balance Test, Plaintiffs had a First Amendment Right to Submit the Protest Letter**

Although the government may not arbitrarily silence the constitutionally protected speech of its employees, as an employer it is afforded the right to limit some employee speech that is

detrimental to the workplace.  *Wernsing v. Thompson*, 423 F.3d 732, 750 (7th Cir. 2005).  In order to determine whether a government employee's speech is constitutionally protected, the Court must engage in a two-part inquiry called the *Pickering* balancing test.  *Wernsing* at 750 (*citing Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).  The question of whether speech is protected is one of law for the Court to decide.  *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

Under the *Pickering* balancing test the Court must first decide if the employee's speech addressed a matter of public concern.  *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004).  If it did, the Court must then decide whether the government's interest as an employer outweighs the employee's interest in commenting on the matter.  *Id*.

**A.      The Protest Letter Addressed a Matter of Public Concern**

The Court analyzes the public concern element by looking at the form, context, and most importantly, the content of the speech.  *Carreon v. Ill. Dep't. Of Human Servs.*, 395 F.3d 786, 791 (7th Cir. 2005).  "At bottom, [the Court] must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community."  *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1099 (7th Cir. 2004).  The Court must also decide if the motive behind the speech was to air the merits of the issue, or merely to air the speaker's private grievance.  *Button v. Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998).  "[S]peech lacks the public concern element if it concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *Id*. at 529-30.

Wist and Chaklos contend that matters of possible governmental waste are inherently

matters of public concern. As they point out, the Illinois Procurement Code provides:

> It is the purpose of this Code and is declared to be the policy of the State that the principles of competitive bidding and economical procurement practices shall be applicable to all purchases and contracts by or for any State agency.

30 ILCS 500/1-5.

Therefore, Wist and Chaklos are correct in their assertion that the Illinois legislature has decreed that, in broad terms, the awarding of a state contract without competitive bidding is a subject of public interest. Defendants counter that the protest letter addresses "no concern except an interest in the contract being awarded to plaintiffs." The Court cannot agree. Although Wist and Chaklos clearly hoped MFS would secure the contract were it opened to competitive bidding, their protest letter addresses the savings that the State of Illinois could realize by opening the contract to competitive bids. As such, Chaklos and Wist do not limit themselves to addressing "only the personal effects" of ISP's decision.

Furthermore, Wist and Chaklos submitted the letter in the form and manner called for by CMS to protest sole source contracts in order to effectuate the State of Illinois's policy of putting all contracts up for competitive bid when feasible. The form, context and content of the letter all appear aimed at bringing a perceived inefficiency to the attention of ISP rather than at airing a personal grievance. Therefore, the protest letter addressed a matter of public concern.

      **B.**      **ISP's Interest as Employer Did Not Outweigh Plaintiffs's Interest**

Even when an employee's speech would normally be protected because it touches on a matter of public concern, there are times when the government, as an employer, must stifle otherwise free speech in order to maintain discipline and efficiency in the workplace. *Waters v. Churchill*, 511 U.S. 661, 668 (1994); *McGreal v. Ostrov*, 368 F.3d 657, 675 (7th Cir. 2004). The

government bears the burden of proving that the employee's interest in speaking is outweighed by the government's interest, as an employer, in promoting harmony in the workplace. *McGreal* at 675. The government is not required to produce evidence of actual workplace disruption in order to prevail. *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 944 (7th Cir. 2004). Instead, the Court gives "substantial weight to the government employer's reasonable predictions of disruption." *Waters* at 673. However, the government must have some evidentiary support to show that its prediction of disruption is reasonable, and not mere speculation. *Gazarkiewicz* at 944.

When conducting *Pickering* balancing, a court weighs the following seven factors: (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999).

Defendants focus on the first of these factors, maintaining that failing to discipline Wist and Chaklos for violating ISP rules (i.e. submitting the protest letter) "would create problems in maintaining discipline and harmony with co-workers who were expected to comply with those rules." In other words, if Wist and Chaklos violated ISP rules by submitting the protest letter (or if it were widely perceived that they violated the rules), and if their coworkers were upset that they were not disciplined, then the workplace might be disrupted. However, this is mere

speculation, because Defendants, beyond their bald assertion, have given the Court no basis for finding this concern to be founded. Therefore, Defendants have not met their burden of showing ISP's interest as employer outweighs Chaklos and Wist's interest in speaking out on a matter of public concern.

Because the form, context, and content of the protest letter addressed a matter of public concern, and because the interests of Chaklos and Wist in writing it were not outweighed by ISP's interests as an employer in maintaining discipline and workplace harmony, the protest letter constituted protected free speech. As such, plaintiffs's First Amendment rights were violated when ISP retaliated against them for writing the protest letter. Therefore, Wist and Chaklos have met the first part of the test to overcome qualified immunity.

II.     **Plaintiffs's Right to Write the Protest Letter Was Not Clearly Established**

In order for Chaklos and Wist to overcome Defendants's invocation of qualified immunity, they must show that it was sufficiently clear to ISP officials that disciplining them for submitting the protest letter violated their First Amendment rights. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (holding that if the law at the time did not clearly establish that government actor's conduct would violate the Constitution, the government actor should not be subject to litigation).

A.     **Plaintiffs Do Not Cite Analogous Cases**

"It is insufficient for a plaintiff simply to point to a recognized constitutional right and claim that the right has been violated." *Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006). Rather, the plaintiff must show that a violation of that right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his

actions violated the plaintiff's rights even in the absence of a factually similar case. *Id*.

The Seventh Circuit has cautioned that when applying qualified immunity in the context of a *Pickering* balancing test, "[d]ifferences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests." *Gregorich v. Lund,* 54 F.3d 410, 414 (7th Cir. 1995). Qualified immunity is not lost merely because the government official was mistaken as to the exact contours of the employee's First Amendment rights. *Id*.

Wist and Chaklos point to no closely analogous cases to show that it would have been clear to Defendants that punishing them for submitting the protest letter was unlawful. Instead, Wist and Chaklos merely assert that ISP officials well knew that it was "unlawful to suspend an employee in retaliation for engaging in protected free speech." This is axiomatic, but does not address the real issue, which is whether ISP officials well knew that it was unlawful to suspend an employee in retaliation for writing a sole source bid protest letter.

**B.    The Contours of Plaintiffs's First Amendment Rights Were Not
So Clear that Defendants Must Have Known Them**

Wist and Chaklos assert that even in the absence of an analogous case, it must have been clear to Defendants that suspending them would be wrongful. In support, Wist and Chaklos assert that DII's conclusions were wrong, that Defendants must have known DII's conclusions were wrong, and that, at any rate, the investigation should never have been conducted. Their reasoning seems to be this: (1) ISP officials could not have found the protest letter to be a policy violation; (2) therefore, ISP officials must have known Plaintiffs had a right to submit it; (3) therefore, ISP officials must have known that a retaliatory suspension was unlawful.

However, the facts show that Defendants requested DII look into whether the protest letter constituted a policy violation. DII conducted an inquiry which concluded that the bid protest letter did constitute a violation of ISP's secondary employment policies. Then, armed with this conclusion, Defendants suspended Wist and Chaklos. Therefore, it is far from clear that Defendants could not reasonably have found submission of the protest letter to be a policy violation. With that underpinning gone, Plaintiffs's entire argument falls. Therefore, Wist and Chaklos cannot show that it was clear at the time of their suspension that they had a right to submit a bid protest letter. Accordingly, Defendants are entitled to qualified immunity from suit.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants's Motion for Summary Judgment (Doc. 31). The Clerk of Court is **DIRECTED** to enter judgment accordingly.


**IT IS SO ORDERED.**
**DATED: September 20, 2007**

                                       s/ J. Phil Gilbert
                                       **J. PHIL GILBERT**
                                       **DISTRICT JUDGE**